Michael Marinaccio and Angelina Marinaccio et al. [1] v. Commissioner. Marinaccio v. Commissioner
Docket Nos. 15857, 15858 and 16755.
United States Tax Court
1949 Tax Ct. Memo LEXIS 226; 8 T.C.M. (CCH) 335; T.C.M. (RIA) 49081; March 30, 1949
*226 During the years 1941 to 1944, inclusive, petitioner was a barber in Washington, D.C., working at his trade. At the end of each year he received an information slip showing the amounts of his earnings for that year based on books and records which had been kept by the employer and which are in evidence. Petitioner kept no record of his tips and merely estimated them. Held, the information slips which petitioner received from his employer correctly represented petitioner's income from the barbering business. Held, further, petitioner underestimated his tips and the amounts in our findings of fact should be used instead of those used in petitioner's returns. Held, further, petitioner's returns were not false and fraudulent with intent to evade tax and respondent's imposition of fraud penalties is not sustained. *227 Walter E. Barton, Esq., Investment Bldg., Washington, D.C., and Hubert G. King, Esq., for the petitioners. E. L. Corbin, Esq., for the respondent. BLACK Memorandum Findings of Fact These proceedings have been consolidated Docket No. 15857 involves deficiencies in income tax and penalties determined against Michael Marinaccio and Angelina Marinaccio for the years 1942 and 1943, respectively, as follows: Year
Deficiency
50% Penalty
1942
$326.18
$163.09
1943
765.88
382.94 Docket No. 15858 involves deficiencies in income tax and penalties determined against Michael Marinaccio for the years 1941 and 1944, respectively, as follows: Year
Deficiency
50% Penalty
1941
$ 52.00
$ 26.00
1944
691.79
345.90 Docket No. 16755 involves a deficiency in income tax determined against Michael Marinaccio of $8.83 for the year 1946. No fraud penalty was determined for 1946. Petitioners by appropriate assignments of error contest the entire amounts of the deficiencies and fraud penalties which have been determined by respondent. Findings of Fact Michael Marinaccio (hereinafter referred to as petitioner) and his wife, Angelina Marinaccio, *228 were residents of Washington, D.C. during the taxable years 1941, 1942, 1943, 1944 and 1946. They were married in 1919 and have two daughters, Evangeline and Gloria. Petitioner filed separate income tax returns for 1941, 1944 and 1946 and he and his wife filed joint income tax returns for 1942 and 1943. These returns were filed with the Collector of Internal Revenue at Baltimore, Maryland. Petitioner was born in Italy on May 31, 1888 and came to New York City in 1902 when he was 14 years old. Upon arriving in this country petitioner began working as an apprentice barber which he had done in Italy before coming over. Petitioner left New York City and went to Washington, D.C. about 1913 where he worked in a barbershop for about four years. He then enlisted in the Navy as a seaman where he also worked as a barber. During the latter period petitioner studied law at night. About 1919 petitioner was given a position as adjuster with the Lumberman's Mutual Insurance Company in New York City. This position he held until 1937, a period of about 17 years. His salary with Lumberman's started at $1,400 but before long he was receiving $2,400 a year. While employed by the Lumberman's Mutual *229 Insurance Company petitioner saved some money and he kept his savings in a safe deposit box at the Bowery Savings Bank in New York City which he rented from July 3, 1933 until April 20, 1937. On or about this latter date petitioner and his wife moved to Washington, D.C. and petitioner brought with him his savings which he had in his New York safe deposit box. On May 11, 1937 after arriving in Washington, petitioner rented a safe deposit box from The American Security & Trust Company and put his savings which he had brought with him in this box. After coming to Washington in April 1937, petitioner and his family lived with his wife's uncle for a few days. Following this they lived in rented houses until 1940 when they bought their home. The home was purchased under the Federal Housing Administration Act at a cost of $6,000 on which petitioner made a down payment of $850. From sometime in 1937 until April 1946, petitioner worked as a barber at the Investment Building Barber Shop in Washington which was owned and operated by Alfonso Peluso. Since May 4, 1946, petitioner has been employed as a barber at the Statler Hotel Barber Shop in Washington. During the taxable years 1941 to *230 1944, inclusive, the practice at the Investment Building Barber Shop which was followed by petitioner was for the barber to give the customer a check showing the charge for the work don and to retain a duplicate copy of the check for himself. At the end of the week the barber summarized the retained duplicate checks and gave them to Peluso, the proprietor, who thereupon paid the barber his week's commission, which was 60 per cent of the charges made to the customers. The prevailing prices for haircuts and shaves in barber shops in Washington from 1941 to 1946 were: Year
Haircut
Shave
1941-April, 1943
$ .50
$.25-.35
April, 1943-May, 1946
.75
.25-.40
May, 1946-
1.00
.50
Peluso kept a record of the weekly commissions paid to his various barbers during 1941, 1942, 1943 and 1944 in a columnar book. A different column was assigned to each barber, petitioner's column being No. 4. At the end of each year Peluso added the commissions entered in the columns assigned to the respective barbers to ascertain the amount paid to each barber during the year. At the end of each of the years 1941, 1942, 1943 and 1944 Peluso gave petitioner a paper (hereinafter called information *231 slip) on which Peluso had written the amount of commissions paid to petitioner during such year according to Peluso's books. Petitioner filed separate income tax returns for 1941 and 1944 and petitioner and his wife filed joint income tax returns for 1942 and 1943 in which the following income and deductions were reported: 1941
1942
1943
1944
Wages
$1,623.80
$1,788.61
$1,688.10
$1,901.77
Tips
75.00
79.50
75.00
100.00
Interest
25.00
15.70
18.25
17.16
Mrs. Marinaccio
185.27
19.03
28.00
$1,723.80
$2,069.08
$1,828.38
$2,018.93
Deductions: Interest
$ 230.28
$ 224.20
$ 218.07
Taxes - Home
78.12
79.20
79.20
Church and Charity
75.00
125.00
125.00
Theatre Tax
2.16
2.16
Phone Tax
1.86
1.86
6.36
Safe-Deposit Box Tax
.80
.80
Barber's License
7.00
7.00
7.00
Clipper Adjustment
5.00
5.00
5.00
Shears and Razors
12.50
12.50
12.50
Barber's Coats
15.00
15.00
Assessment Tax
Total deductions
$ 427.72
$ 457.72
$ 468.13
Net Income Reported
$1,723.80
$1,641.36
$1,370.66
$1,550.80
Petitioner did not keep any books in which he recorded his wages or commissions earned during *232 the years 1941 to 1944, inclusive. He depended upon Peluso to give him the information necessary to make his income tax returns for said respective years, which Peluso did on the information slips heretofore described. The information slips furnished to petitioner at the end of each year showed as follows: Year
Information Slips
1941
$1,623.80
1942
1,788.61
1943
1,688.10
1944
1,901.77 These amounts were reported by petitioner on his returns. The amounts of interest reported by petitioner for 1942, 1943 and 1944 represented the amounts of interest which he received on savings accounts at the Hamilton National Bank, American Security & Trust Company and Security Savings & Commercial Bank of Washington during said respective years. The interest reported by petitioner for 1941 was estimated to be $25. The correct amount of interest received by petitioner was $9.38. Petitioner received no additional interest during the years 1941 to 1944, inclusive. Earnings of petitioner's wife of $200.97 and $47.03 were reported in their joint income tax returns for 1942 and 1943, respectively. These amounts represent the total earnings of petitioner's wife for the years 1941 *233 to 1944, inclusive. Petitioner reported estimated tips as follows: 1941
$ 75.00
1942
79.50
1943
73.00
1944
100.00 Petitioner's tips so reported were underestimated. His own tax return for 1946 shows "Tips (10% average) $312.77" which was based on 10 per cent of his barber earnings for that year of $3,127.75. His estimate for tips for years 1941, 1942, 1943 and 1944 should have been on substantially the same basis. On the evidence we find petitioner's tips were as follows: 1941
$162.00
1942
178.00
1943
168.00
1944
190.00
The amounts deducted for interest and taxes for 1942, 1943 and 1944 represented payments made by petitioner to the Riggs National Bank for interest on the mortgage on his home and real estate taxes paid on his home. The deductions for church and charity for 1942, 1943 and 1944 represent estimated contributions made by petitioner principally to the Church of God where he attended church a couple of times a week. Included in the amounts also are contributions to the Red Cross, Community Chest, Salvation Army, etc. Said amounts were expended for the purposes named. Deductions for theatre, telephone and safe deposit box *234 taxes for 1942, 1943 and 1944 were estimated by petitioner. They were reasonable in amount and were expended by petitioner for such purposes. Dedections for barber's license, clipper adjustment, shapening of shears and razors, and laundry of barber's coats represent estimated expenses paid out by petitioner in connection with his trade of barbering during the years 1942, 1943 and 1944, respectively. These amounts were reasonable in amount and were expended by petitioner for the purposes named. Petitioner's youngest daughter, Gloria, was unmarried and living with the family during the taxable years 1941 to 1944, inclusive. She became 18 years of age on October 27, 1941. Gloria graduated from high school in June 1941 and immediately went to work and was employed from then on during the taxable years at salaries which ranged from $23 to $32 a week. She did not pay over any of this 7mney to her father, the petitioner. She did pay over some of it to her mother to help pay family expenses. The amount which she paid to her mother is not shown by the evidence, except that it did not exceed $5.00 to $10 per week which was her contribution for the added cost of food and other household expenses *235 made necessary by her continuing to live with her mother and father. During 1946 petitioner paid $250 as attorney's fees for representing him in connection with the deficiencies determined against him for 1941 to 1944, inclusive, in the Treasury Department. The Commissioner rejected as incorrect the returns which petitioner filed for the years 1941, 1942 and 1944 on the grounds that petitioner's books and records were insufficient to enable him to check petitioner's reported income and deductions. The Commissioner determined the net income and tax liability of the petitioner for each of the years involved on the basis of a comparison of his net worth at the end of each of the years in question and added thereto estimated living expenses and other personal expenses. In arriving at the net worth the Commissioner has listed the following assets and liabilities: Cash on hand, cash in banks, United States Savings Bonds, real estate and mortgage on home. The net worth and the net income of petitioner as at December 31, 1940, December 31, 1941, December 31, 1942, December 31, 1943 and December 31, 1944, were determined by respondent as follows: 1940
1941
1942
1943
1944
Cash on Hand
$ 700.00
$ 900.00
$ 1,450.00
$ 3,150.00
$ 5,400.00
Cash in Banks: Hamilton National
28.56
328.56
366.36
369.92
373.59
American Security & Trust Company
109.20
316.71
423.51
576.63
739.72
Security Savings & Commercial Bank
314.00
485.60
685.35
697.37
1,007.40
United States Savings Bonds
131.25
1,031.25
2,250.00
2,250.00
Real Estate
6,250.00
6,250.00
6,250.00
6,250.00
6,250.00
Total Assets
$7,401.76
$8,412.12
$10,206.47
$13,293.92
$16,020.71
Less: Mortgage on Home
5,300.64
5,176.39
5,046.43
4,910.49
4,768.32
Net Worth
$2,101.12
$3,235.73
$ 5,160.04
$ 8,383.43
$11,252.39
Net Worth Increase
$1,134.61
$ 1,924.31
$ 3,223.39
$ 2,868.96
Add Expenditures: Allowance to wife
520.00
520.00
520.00
520.00
Insurance Premiums Paid
50.00
50.00
50.00
50.00
Electric Bills
48.00
48.00
48.00
48.00
Water Bills
8.75
8.75
8.75
8.75
Heating expense
96.00
96.00
96.00
96.00
Allowance for Food
700.00
700.00
700.00
700.00
Income Taxes
37.00
88.30
141.52
Net Income
$2,557.36
$ 3,384.06
$ 4,734.44
$ 4,433.23
*236 The item "Cash on Hand" as shown in the table above was determined by the Commissioner on the basis of $5,750 in currency which was contained in petitioner's safety deposit box when it was opened by petitioner in the presence of an internal revenue agent in 1946. The allocation of the alleged accumulations during the taxable years 1941, 1942, 1943 and 1944 was made by taking the dates of issue of the bills in the box and allocating them to the years in which they were issued by the Treasury Department. Petitioner had no business or trade during 1941 to 1944, inclusive, except barbering. He had no other transactions during said years in which he made a gain or sustained a loss. Petitioner's returns for 1941, 1942, 1943 and 1944 were not false or fraudulent with intent to evade tax. Opinion BLACK, Judge: We will first take up the deficiency of $8.83 which the Commissioner determined against petitioner for the year 1946. This deficiency was based on respondent's disallowance of an attorney's fee of $250 which petitioner paid to his attorney in 1946 for his services in representing petitioner before the Treasury Department in matters connected with his income tax liability for *237 the years 1941, 1942, 1943 and 1944. In his brief respondent concedes that the evidence shows that petitioner made the payment to his attorney in 1946 and that it was paid for the purposes claimed. Respondent, therefore, concedes that petitioner is entitled to the deduction claimed. Effect to this concession will be given in Rule 50 computation. Respondent also makes the following concession in his brief: "Respondent concedes that should the Court hold that petitioner is not guilty of fraud for the taxable year 1942, any deficiency for 1942 is eliminated under the provisions of Section 6 of the Current Tax Payment Act of 1943, and that the unforgiven portion of any tax found due for 1942 shall be taken into consideration in arriving at the correct tax liability for 1943." Inasmuch as we have made a finding of fact that petitioner's return for 1942 was not false or fraudulent with intent to evade tax, petitioner should be given the benefit of the forgiveness feature of the Current Tax Payment Act in a computation under Rule 50. This leaves for our discussion and decision: (1) Whether any deficiencies of income taxes are payable by petitioners for the years 1941, 1942, 1943 and *238 1944; and (2) if any deficiencies are payable by petitioners, whether such deficiencies are due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code. The Commissioner's determination of the deficiencies against petitioner is prima facie correct and the burden of proving that the correct income was in an amount less than that on which the deficiency has been computed is upon the taxpayer. Bishoff v. Commissioner, 27 Fed. (2d) 91; Kenney v. Commissioner, 111 Fed. (2d) 374. Petitioner filed income tax returns for each of the years 1941 to 1944, inclusive, in which he gave details as to his gross income and deductions. These have been shown in our findings of fact. Respondent has determined these returns were false and fraudulent with intent to evade tax and has disregarded them and has used the increase in net worth basis in determining petitioner's net income for each of the years in question. That method has been approved by the courts in some instances. See Kenney v. Commissioner, supra, and cases there cited. In the Kenney case the method of determining the gross income *239 of a professional gambler who kept no books or records, by ascertaining annual increase in his net worth for each year and adding thereto personal expenditures not reflected in such increase, was approved. We have no such case here. Petitioner was not a professional gambler but was a barber employed regularly at his trade. It is true that petitioner kept no books and records of his own which showed his earnings as a barber for each of the taxable years, but the barbershop for which he was working kept a daily record of petitioner's earnings in the barbershop, as well as the daily earnings of the other barbers working in that shop, and these records were introduced in evidence and are part of the records in these proceedings. At the end of each year an information slip was furnished to petitioner by his employer, Alfonso Peluso, who was the proprietor of the barbershop in the Investment Building where petitioner worked. These information slip, as well as the books upon which they were based, are in evidence and show petitioner's 60 per cent share of the barber fees collected, as follows: 1941
$1,623.80
1942
1,868.11
1943
1,688.10
1944
1,901.77
These were the *240 amounts which petitioner returned as parts of his gross income for the respective taxable years. Respondent would have us reject this and adopt his substitute net worth basis, details of which are given in our findings of fact. This we are unwilling to do in the face of the great amount of evidence which we have before us which seems to substantiate the approximate correctness of the records which petitioner used in making his returns. Respondent justifies his method of rejecting the information slips which petitioner used and which were based on the actual records of his employer and substituting therefor the increase in net worth method, principally upon the ground that respondent's revenue agent found $5,750 in currency in petitioner's safe deposit box when it was opened in 1946 by petitioner at the request of the internal revenue agent. The effect of respondent's determination is to hold that substantially all of this $5,750 represented savings by petitioner after he came to Washington in 1937 and to hold that most of it represented savings in the years 1941 to 1944. Petitioner denies this and says the currency in the main represented accumulations prior to his coming to Washington *241 in 1937 and that most of his savings after coming here were invested in the residence which he purchased largely on credit and the United States Savings Bonds which he purchased from time to time and which were kept in his safe deposit box. It seems to us that petitioner's explanation in this regard is in the main plausible. The evidence was that petitioner is a man who does not gamble, drink or smoke and that he is economical and thrifty in his habits. If this is true, and there is no evidence to the contrary, it is not reasonable to assume that petitioner suddenly turned economical and thrifty after he came to Washington and accumulated all this currency after he came here. It seems reasonable to believe petitioner's story that most of it represented accumulations which he had saved while living in New York City and which was kept while he was living there in his safe deposit box at the Bowery Savings Bank. If respondent's determination is correct it means that petitioner came to Washington in 1937 with practically no life savings and accumulated it all after he got here. This seems quite unlikely. We also think it is quite unlikely that petitioner could have accumulated all this *242 currency out of his earnings as a barber in the years determined by respondent, especially in view of the barbershop prices which then prevailed. The evidence was that he was engaged in no other business whatever. Another circumstance which makes us unwilling to accept respondent's determination as correct is that petitioner's return for the year 1946 is in evidence and it shows that petitioner's income from barber fees for the four months he was employed by Alfonso Peluso in the Investment Building was $851.75 and for the eight months he was employed in the Hotel Statler Barber Shop he was paid $2,276, making a total for the year of $3,127.75. When it is considered that a substantial increase in barbershop prices took place in 1946 over what they were in the taxable years 1941 to 1944, inclusive, petitioner's gross income from his barbering work in the years 1941 to 1941 does not seem out of line with that reported by him in 1946. Respondent has raised no question as to the correctness of petitioner's 1946 return. The only adjustment which he made for that year was to disallow $250 which petitioner paid his attorney for services before the Treasury Department. That disallowance *243 he now concedes was error. So, after taking into consideration all the evidence, we have concluded that we should accept as correct petitioner's returns of income from his wages in the barbering business for all four of the years before us, 1941 to 1944, inclusive. This does not apply to tips. We are convinced that petitioner underestimated his tips. He received no information slips from his employer as to these - his employer had nothing to do with them. Petitioner simply estimated them. Our conclusion that he underestimated them is based largely on the fact that he himself returned $312.77 as tips for the year 1946. This was based on 10 per cent of $3,127.75 which he received from his barbering fees in that year. There is no testimony to the effect that tips, percentage-wise, were any less in the years 1941 to 1944 than in 1946. We have no reason to believe they were. We have, therefore, found on the evidence that petitioner's tips were: for 1941, $162; for 1942, $178; for 1943, $168 and for 1944, $190. These figures should be used in a recomputation under Rule 50 instead of the amounts reported as tips on petitioner's returns. It may be well to point out that petitioner's return *244 of tips in 1946 based on 10 per cent of his earnings was not based on 10 per cent of the total amount collected from the customer. Of the amount collected from the customer, 40 per cent went to the owner of the shop. Petitioner in his calculation of tips in 1946 used 10 per cent of the amount which he retained. In effect this amounts to six per cent of the amount collected from the customer. As we have already stated, we have no reason to believe it was any less percentage-wise for the years 1941, 1942, 1943 and 1944. There is no reason to hold that petitioner's underestimate of his tips for the years in question was fraudulently done with intent to evade tax and we have not so found and do not so hold. The deductions which petitioner claimed on his returns have been substantiated by the evidence and should be allowed as claimed on his returns. We do not understand respondent to question the validity of these deductions unless we reject the correctness of petitioner's returns and approve respondent's net worth basis of figuring petitioner's net income for the respective taxable years. There is one other matter upon which respondent lays considerable stress in his brief and that *245 is that petitioner's two daughters paid him certain of their earnings in the taxable years which he did not report on his returns. Respondent made no determination of such income in his deficiency notice. We have examined the record of the evidence on this point at the hearing and find that it shows this: His oldest daughter, Evangeline, after graduating in June 1939 worked to March 1940 when she married. During the time she worked she turned over all her earnings to petitioner and he said this amounted in all to $648. This was prior to any taxable year we have before us and manifestly on any theory would not be includible in petitioner's income for any of the years we have here. As to petitioner's other daughter the following question and answer occur in his testimony: "Q. How about your other daughter? "A. The second daughter - her name is Gloria. She graduated from Roosevelt High School in 1941, was married in 1945; she didn't go to business college; she immediately got a job with the Continental Insurance Company in the Investment Building, immediately after graduation, and after that she worked for about two years, a couple of years, with Kent Jewelers, from 1941 to 1945. *246 She worked for those two concerns, earning various amounts, from $23 to $32 a week, and she never gave me the total amount, as the oldest daughter did. The only thing she did was this: She contributed to my home. In other words, she gave the money to my wife. She was more attached to my wife - let us put it that way. She gave the money to my wife, which made me give less to my wife. * * *" From this testimony it appears that Gloria in 1941 and 1942 was employed after her graduation in June 1941 by the Continental Insurance Company and in 1943 and 1944 she was employed by Kent Jewelers. Even assuming that her pay per week was the lower figure of $23 per week it would amount to $1,196 per year. Section 29.51-3 of Regulations 111 provides: "Return of Income of Minor. - An individual, although a minor, who is single, is required to render a return of income if he has a gross income of his own of $500 or over for the taxable year, regardless of the amount of his net income * * *" We assume that Gloria filed her own income tax returns under the foregoing regulations for each of the taxable years involved here. She clearly was taxable on her own income just as an adult would be. If *247 she took some of her money and gave it to her father or mother, clearly such gift would not be taxable to them as income. However, any contributions which she made to the upkeep of the family household raises a different question. That would not be a gift. If such contributions exceeded the cost of the household expenses attributable to Gloria, it would be income to petitioner. The evidence as to what Gloria paid as a contribution to household expenses during the taxable years is very meager. From it we have found that from the time she became employed around July 1, 1941 on through to the end of 1944, she contributed $5.00 to $10.00 a week to help defray household expenses. We further find from this same meager evidence that this money was used by petitioner's wife to pay the added cost of food and other household expenses made necessary by Gloria continuing to reside in the household. In the light of these findings these contributions by Gloria to the household expenses did not result in net income to petitioner - they were no more than her part of the household expenses. There still remains for discussion respondent's determination of fraud penalties. Our finding of fact that *248 petitioner's income tax returns for the years 1941, 1942, 1943 and 1944 were not false and fraudulent with intent to evade tax, of course, necessitates our holding that respondent's imposition of fraud penalties is not sustained. It goes without saying that if we had found that substantially all the $5,750 cash which respondent found in petitioner's safe deposit box in 1946 represented income to petitioner in 1941, 1942, 1943 and 1944 as respondent determined, we would have little hesitation in sustaining respondent's imposition of fraud penalties. There would be no satisfactory explanation in the record as to why such large amounts were omitted from petitioner's returns. But, as already stated, we are not convinced that these amounts did represent income to petitioner during the years in question. Our reasons have already been stated and it would serve no purpose to repeat them. Respondent's determination of fraud penalties is not sustained. Decisions will be entered under Rule 50. Footnotes
1. This proceeding was consolidated with Michael Marinaccio, Docket Nos. 15858 and 16755.↩